## FREEMAN v. UNITED STATES.

District Court, E. D. Kentucky.

Feb. 17, 1931.

Perry B. Miller, of Louisville, Ky., for plaintiff.

Sawyer A. Smith, U. S. Atty., of Covington, Ky., Errol Draffen, Asst. U. S. Atty., and George R. Brown, Jr., Regional Atty., U. S. Veterans' Bureau, of Louisville, Ky., for the United States.

ANDREW M. J. COCHRAN, District Judge.

This cause is before me on final hearing. It is an action on an insurance policy issued under the World War Veteran's Act (38 USCA § 421 et seq.), after the end of such war, to an enlisted man employed in active service under the Navy Department. He enlisted April 17, 1919 and was honorably discharged April 8, 1921. The claim is that at the time of his discharge he was totally and permanently disabled and by reason thereof his policy was then matured, and hence did not lapse by his failure thereafter to pay the premiums on it. I find in the decisions statements as to policies so maturing thereafter so lapsing. As I view it a policy which matures never lapses. In order to the existence of such disability at that time he must then have been suffering from a personal injury or disease which incapacitated him permanently from following continuously any substantially gainful occupation. The matter is thus put in the last reported decision dealing with cases of that character, to wit United States v. Meserve (C. C. A.) 44 F.(2d) 549, 550: "Total disability within the meaning of the policy is any disability of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation, and such disability is deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

As I make it, the occupation which he is disabled from following continuously must be one that he is adapted to follow. It is immaterial that he is physically able to follow such an occupation if he is not otherwise adapted to so do. The question may arise in a given case where the disability is rested on a certain disease whether such disease must then be existent, or will it be sufficient that the seed of the disease is then in his body. It would seem that, if, in any case, it would be sufficient that the seed of the disease so existed, it is essential that necessarily and inevitably the disease must thereafter develop from such disease so that it can then be said that he is potentially so diseased, and hence potentially so disabled.

The burden is on the plaintiff to establish by a preponderance of the evidence the existence of such disease or seed and consequent disability at the time of the discharge. In order to do this the plaintiff must introduce substantial evidence to this effect, and, even though he may do so, he cannot recover, if it is overcome or equalized by substantial evidence introduced by the defendant. The plaintiff's failure to so establish cannot be supplied by grace. This court is not the government passing on the question whether the plaintiff should have a pension. The question before it is whether plaintiff is entitled to recover on his policy of insurance and to this end he must bring himself within its terms. Hence it is that it is not sufficient for plaintiff to establish the subsequent incurrence or existence of such disease or seed thereof and consequent disability. It must have existed at the time of the discharge.

Coming then to the case in hand, what do we find? In argument the disease on which plaintiff's case is rested is goiter. There is no direct evidence of his having it before March 23, 1923, nearly two years after his discharge. A Bureau examination was made on that date, because, no doubt, of a pending application for compensation and the diagnosis was "Exophthalmic Goiter." In the report thereof it is said that the thyroid gland was "moderately enlarged," and that exopthalmós was "moderate." On a subsequent examination made October 13, 1923, the diagnosis was "Exophthalmic goiter toxic" and prognosis "poor." Not a solitary witness testifies to his having goiter before March 23, 1923. Of course he must have had it for some time before that, but how long does not appear. The plaintiff himself gave no testimony as to when he first took notice of it. It is said in brief for defendant that he made an application for compensation in December, 1922, and that he made no mention therein of his then having a goiter, but that he testified that he then had it. I find no such testimony, and the application or any testimony in relation thereto is not in the record. It is certain that he did not have the goiter at the time of his discharge because he testified as to his then condition and he makes no mention of it. Nor is there any other evidence of his then having it. If then the plaintiff is to recover, it is essential that the evidence establishes that he then had the seed of it, and that it was the necessary and inevitable outcome of it, or he must have then had some other disease which not only then totally but also permanently disabled him.

The plaintiff testified that shortly after he went into the service he was subject to disciplinary double timing. This was followed by nervousness and violent headache. He felt bad, was very nervous, could not sleep at nights like he once did, and had cramps in his sleep. He was placed in the hospital and remained there for 22 days. Whilst there it was diagnosed that he had appendicitis, and an operation was proposed, to which he refused to submit and after results showed that he did not have appendicitis. It was on June 30, 1919, that such diagnosis was made, and he was dismissed from the hospital and went back to duty July 14, 1919. This is his sole testimony as to his condition whilst in the service except at the time of his discharge. As to his then condition he testified that his health was bad—that he was affected with nervousness, heart seemed like it was going to stop beating—that he had severe headaches, seemed to smother, and had pain in his back, knees, back of his shoulder blades, and that he had been gradually losing weight, and that just after he came out of the service he weighed 127 pounds as against 174 in the last part of 1919. It will be noted that he weighed 174 pounds long after his hospitalization in the summer of 1919. Seemingly whatever was the matter with him then had no effect on his weight, except that when he came out of the hospital, as he testified, he had lost 10 pounds, and the subsequent reduction to 127 pounds could not have been due to it. The evidence is silent as to what could have caused this reduction. This reduction came about, notwithstanding his appetite was extremely good. He just got right on down until he was not able to get out of bed without being helped. He had nausea and stomach trouble and vomited. He consulted a physician, who has since died, in June, 1921, and he told him that he had heart trouble, stomach trouble, liver trouble, kidney trouble, and rheumatism. Four of his acquaintances testified on his behalf. One testified that after his return he was thinner and since then the condition of his health has not been very good. He said that he noticed a difference in the appearance of his eyes and nervousness about him, but he did not say when he first noticed this. Another testified that the condition of his health eight or ten days after his return was not near as good in looks appearance, and weight. He seemed to be nervous and shaky and to be weak and short of breath. Another testified that when he got home he was not as fleshy as he was and was very weak and nervous. The fourth one testified that he looked like he had a pretty good spell of sickness and did not look like he did when he went away. When asked whether he noticed any difference in the appearance of his eyes, he first said that he did not believe he did and then said "Yes, in a sense of the work (word?) I noticed that." I am unable to make out what this means. Then when prodded he said that he noticed a change in his disposition, and that he was morbid, and a difference in his nervous condition, and that his appearance or morbidness was worse after he came back, which words were put in his mouth by the examination. His brother testified that he looked quite bad when he got home, and was underweight. A picture of a family or neighborhood gathering taken shortly after his return in which he appeared was introduced in evidence and its showing is stressed. But I am unable to make out of it that he was then

in a serious condition. He seems to have been able to participate in such a gathering.

Plaintiff and these witnesses were testifying as to conditions nearly ten years before with nothing to lead them to keep them distinctly in mind in the meantime. The weight of his testimony is affected by his interest in the outcome of this action and by his condition at the time of testifying. Dr. Sievers testified that when plaintiff visited him he wanted to talk about his condition all the time and did not want to talk about anything else.

It took a long time to get away from him. He seemed to worry and to be afraid of an early death which was calculated to make him to imagine things and to talk himself into believing them. Then, as to his acquaintances and brother, naturally they would be disposed to help him all they could. But taken by itself this may be said to be substantial evidence to the effect that he was then in a bad condition physically. This, however, is not the whole case. At the time of his discharge, he signed a certificate, contained in it, which was in these words: "This is to certify that I have no physical disability entitling me to compensation, under the War Risk Insurance," and it is stated therein that he was "examined for discharge, no defects noted." This is not to be brushed aside by his testimony that he did not read anything to the effect that he had no physical disability, and that he was just told to sign the paper and did so without knowing what was in it. He further testified that on that occasion the doctor asked him if he felt all right, and that he told him that he did. This he says he did, notwithstanding he was not then feeling all right, but was actually sick, and that he did so in order to get home. This is an admission that to accomplish an ulterior purpose he deliberately told what was not so. This is not like a case where a soldier or sailor about to be discharged may not have realized his condition. He did realize it and told an untruth about it. And it does not readily appear to me how such a statement would help him to get home. Then there is no reason to think that the examination made of him was superficial. There is no indication that a great number of sailors were being discharged at that time which might lead to a more or less superficial examination. Then according to plaintiff's testimony he was treated by three physicians after his return home, apparently in succession, the first of whom is dead. The testimony of the other two was not taken, and no explanation is given why it was not. Circumstances which may be said to make

against plaintiff are that after his return he married and has had six children, and the assertion of the claim is an afterthought. Of course he had a right to marry, and it may be that he was not advised at the time of his discharge or until after the enactment of legislation allowing him, at the time he filed his petition herein, to assert his claim as to his rights. And neither circumstance may be said to have much weight. Yet they have some and are entitled to be weighed in marshaling the considerations pro and con as to plaintiff's rights.

The result is that I do not feel sure as to just what was plaintiff's physical condition at the time of his discharge. If it be conceded that it was such as to render it impossible for him then to follow continuously substantially gainful occupation, so that it may be said that he was then totally disabled, apart from the tendency of the evidence to make out that he then had in his body the seed of his subsequent goiter, it cannot be said that his condition was such as to render it reasonably certain that such condition would continue throughout his life.

As to whether the evidence has any such tendency, I am unable to make out and I have not had the benefit of any expert opinion to help me form an opinion as to this. It is true that plaintiff testified that he first began to notice the condition of his eyes as protruding whilst in the service, the date not remembered, and that when he was discharged, though he was falling off in weight, his appetite was extremely good, which Dr. Sievers testified was a symptom of goiter condition. But in the state of the evidence I cannot act on this testimony of plaintiff as to the protrusion of the eyes. No one else took notice of this at the time of the discharge or shortly thereafter. It must be accepted that it did not appear until sometime after his discharge, just when not appearing. Then as to whether a good appetite accompanied by loss of weight is a symptom of goiter condition, Dr. Davis on behalf of defendant testified that it was not, and that on the contrary such condition would cause a loss of appetite.

In addition to what has already been said as to the evidence bearing on the question as to when plaintiff's goiter first developed, it is to be noted that plaintiff never went to any physician about his condition in this respect until the spring of 1923, and he was then suffering also from stone in the kidney, and that Dr. Davis testified that in October, 1923, when he examined plaintiff on behalf of the Bureau, his goiter was in its early stages. So

far as there was any expert opinion introduced on the subject, it was to the effect that there is no way of telling when a goiter originates or starts. I cannot, therefore, see my way clear to hold that at the time of plaintiff's discharge the seed of goiter was then in his body. The evidence does not warrant it.

There is another feature of the case that would call for consideration and determination if I had not come to this conclusion. The risk of an operation for goiter is slight. The Bureau in October, 1923, through its examining physician, advised plaintiff to undergo an operation for his affliction and offered to provide it without expense to him. This he refused. His refusal was unreasonable from his own standpoint. No reasonable man would be willing to endure the affliction of goiter rather than incur the risk of an operation for its removal. It is open to say, therefore, that plaintiff's incapacitation on account of his goiter was not permanent, inasmuch as it was reasonable for him to undergo an operation for its removal. The necessities of this case do not require that I determine this question.

I am constrained to hold that plaintiff's petition must be dismissed.